**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TOMPKINS, INC.,

Plaintiff, Case No. 2:24-cv-10510

v.

Hon. Brandy R. McMillion
United States District Judge

WLAJ-TV, LLC, *et al.*,

Defendants.
_______________________________________/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 49)**

Plaintiff-landlord Tompkins, Inc. ("Tompkins") seeks relief from Defendant-tenant WLAJ-TV LLC ("WLAJ-TV") and guarantor Sinclair Communications, LLC ("Sinclair") (collectively "Defendants") arising from a commercial landlord-tenant contractual dispute. *See generally* ECF No. 28. Following this Court's Opinion and Order on the Defendants' Motion to Dismiss and Motion for Judgment on the Pleadings, Tompkins' claims were narrowed. *See* ECF Nos. 21, 45. Four claims remain: three for distinct breaches of contract (Counts V, VIII, & IX) and one for Sinclair's secondary liability as a guarantor of WLAJ-TV to the lease agreement (Count XI). *See* ECF No. 45.

Now before the Court is Defendants' motion seeking summary judgment pursuant to Federal Rule of Civil Procedure 56 on the remaining claims. *See* ECF

No. 49. The motion has been adequately briefed so the Court can rule without oral argument and based on the record before it. *See* ECF Nos. 52, 54; E.D. Mich. L.R. 7.1(f). For the reasons stated below, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 49) and dismisses Plaintiff's remaining claims with prejudice.

**I.**

As stated in preceding orders, this case relates to a landlord-tenant relationship that spanned over 40 years. WLAJ-TV assumed the operative Lease Agreement (hereinafter the "Lease" or "Lease Agreement") on March 1, 2013. *See* ECF No. 49, PageID.1106; ECF No. 28, PageID.494. The original lease, dated January 25, 1982, has been amended, assumed, and assigned several times after its inception, resulting in the current Lease Agreement.[1] The Lease has always covered land located at 4543 Baseline Road, Rives Junction, Michigan, which was used "to

[1] Tompkins and WLAJ-TV LLC (successor by assignment to Freedom Broadcasting of Michigan, Inc.) are parties to that certain Lease, dated as of January 25, 1982 (the "Original Lease"), as amended by an Amendment to Lease Agreement dated August 21, 1984 (the "First Amendment"), as amended by the Second Amendment to Lease Agreement entered June, 1990 (the "Second Amendment"), Consent and Acknowledgment dated June 5, 1990 (the "Consent and Acknowledgment"), Third Amendment to Lease Agreement dated December 27, 1990 (the "Third Amendment"), and Fourth Amendment to Lease Agreement dated October 25, 1995 (the "Fourth Amendment"), Assignment and Assumption of the Lease dated August 19, 1998, from Tenant Lansing 53 to WLAJ to Freedom Broadcasting of Michigan, Inc., Assignment of Rights Under Lease dated December 6, 1999, by Robert P. Benko, Mary Benko, George E. Benko, and Ella F. Benko to Tompkins, Fifth Amendment to Lease Agreement dated January 12, 2012 and effective January 1, 2012 (the "Fifth Amendment"), Assumption Agreement dated December, 2012, between Tompkins and Sinclair Communications, LLC, and Assumption and Consent Agreement dated as of March 1, 2013, by and between Tompkins, Inc. (Landlord) and WLAJ-TV LLC (Tenant) and executed by Sinclair as Guarantor. *See* ECF No. 28, PageID.494-495, ¶13.

transmit communications signals for a television studio and tower." *See* ECF No. 28, PageID.506, 559. The remaining claims before the Court concern the tower, generator, and transmitter equipment. Previously, at the motion to dismiss phase, the Court credited Tompkins' account that it owned all three items, as it alleged. *See* ECF No. 45, PageID.924. However, that issue is now at the heart of this Motion.

In 2016-17, the FCC conducted a "broadcast incentive action" to repurpose portions of the television band – channels 38 through 51— for wireless broadband service. *See* ECF No. 49, PageID.1108. Following the auction, the FCC implemented a nationwide channel "repack," that reassigned many television stations to new channels to consolidate broadcast operations. *See* ECF No. 49, PageID.1108-1109. WLAJ-TV was one of the affected stations. *Id.* at PageID.1109. It was required to vacate channel 25 by January 17, 2020 and relocate to channel 14 to avoid causing broadcast disruptions. *Id.* That ultimately led to WLAJ-TV vacating Tompkin's property. *Id.* The parties' dispute arose after WLAJ-TV decided not to renew the lease with Tompkins in December 2022. *Id.* at PageID.1109-1110. When WLAJ-TV sought concurrence on dismantling the Tower because of the FCC channel inoperability change, Tompkins opposed; and WLAJ-TV subsequently agreed to transfer ownership of the Tower to Tompkins upon expiration of the lease. *See id.* at PageID.1110.

Tompkins originally alleged eleven claims against the Defendants. *See* ECF No. 1. Following timely removal from the Jackson County Circuit Court, previous Defendants Mission Broadcasting, Inc. and Nexstar Media Inc. filed a Motion to Dismiss, which the Court granted. ECF No. 14; ECF No. 21. After their dismissal, Tompkins filed a First Amended Complaint ("Amended Complaint") against WLAJ-TV and Sinclair. ECF No. 28. Defendants WLAJ-TV and Sinclair filed Answers and also moved for Judgment on the Pleadings under Rule 12(c), which the Court granted in part. *See* ECF Nos. 13, 15, 32, 37, 45.

Consistent with the Court's previous orders, several provisions of the Lease Agreement remain relevant here. Paragraph 13 of the Lease Agreement, titled "Repairs," states:

> (13) The Landlord after receiving written notice from the Tenant and having reasonable opportunity thereafter to obtain the necessary workmen therefor agrees to keep in good order and repair the roof and the four outer walls of the premises but not the doors, door frames, the window glass, window casings, window frames, windows or any of the appliances or appurtenances of said doors or windows casings, window frames and windows, or any attachment thereto or attachments to said building or premises used in connection therewith.

ECF No. 28, PageID.535. Paragraph 15 of the Lease Agreement, titled "Repairs and Alterations," states:

> (15) Except as provided in Paragraph 13 hereof, the Tenant further covenants and agrees that he will, at his own expense, during the continuation of this lease, keep

> the said premises and every part thereof in as good repair and at the expiration of the term yield and deliver up the same in like condition as when taken, reasonable use and wear thereof and damage by the elements excepted. *The Tenant shall not make any alterations, additions or improvements to said premises without the Landlord's written consent*, and all alterations, additions or improvements made by either of the parties hereto upon the premises, except movable office furniture and *trade fixtures put in at the expense of the Tenant*, shall be the property of the Landlord, and shall remain upon and be surrendered with the premises at the termination of this lease, without molestation or injury.
>
> The Tenant covenants and agrees that if the demised premises consist of only a part of a structure owned or controlled by the Landlord, the Landlord may enter the demised premises at reasonable times and install or repair pipes, wires and other appliances or make any repairs deemed by the Landlord essential to the use and occupancy of other parts of the Landlord's building.

*Id*. (emphasis added).

These terms of the Lease, as amended and assigned, form the basis, in part, of Tompkins' remaining claims against Defendants, which are:

(1) *Breach of Contract*: WLAJ-TV failed to maintain the premises (Count V);

(2) *Breach of Contract*: WLAJ-TV removed the transmitter, and communication equipment, including the generator, from the building (Counts VIII, IX);

(3) *Breach of Contract/Guaranty*: Sinclair breached its obligations to Tompkins when it failed to pay for the amounts due on WLAJ-TV's behalf (Count XI).

*See* ECF No. 28, PageID.512, 520, 522, 529-530.

Defendants filed the instant Motion for Summary Judgment on all of Tompkins' remaining claims. *See* ECF No. 49. The Motion is fully briefed, with a sufficient record before the Court; therefore, oral argument is unnecessary to rule on the merits in this matter. *See* ECF Nos. 51, 52, 53, 54; E.D. Mich. L.R. 7.1(f).

**II.**

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating the motion, the Court must determine "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"To survive summary judgment, the nonmoving party 'must present significant probative evidence' putting the material facts in doubt." *Walden v. GE Int'l, Inc.*, 119 F.4th 1049, 1057 (6th Cir. 2024) (quoting *Green Genie, Inc. v. City of Detroit, Mich.*, 63 F.4th 521, 526 (6th Cir. 2023)). The "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P.

56(c)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive a motion for summary judgment. *Anderson*, 477 U.S. at 252.

Additionally, the Court is under no obligation to parse a summary judgment record to search out facts or evidence not brought to its attention. *In re Morris*, 260 F.3d 654 (6th Cir. 2001). It is the obligation of the non-moving party . . . not the Court, to scour the record in search of the evidence that would defeat a motion for summary judgment: Rule 56 requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (citation modified). Moreover, conclusory assertions, supported only by a party's own opinions, do not create a genuine issue of material fact that can withstand a motion for summary judgment. *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008); *see also Johari v. Big Easy Rest., Inc.*, 78 F. App'x 546, 548 (6th Cir. 2003).

**III.**

In this case, four claims remain: three claims against WLAJ-TV for breach of contract and one against Sinclair as guarantor of WLAJ-TV to the lease agreement.

*See* ECF No. 45, PageID.949. In the Motion for Summary Judgment, the parties' dispute turns on three interconnected questions: whether a genuine dispute of material fact exists that WLAJ-TV breached the expired lease agreement when it (1) vacated the premises without adhering to the recommendations within the 2014 inspection report, (2) removed equipment it purchased, installed, and operated for broadcasting on Plaintiff's premises, and (3) whether Sinclair is liable as a guarantor for WLAJ-TV's breach. *See generally* ECF No. 49. The Court will address each issue in turn.

## A. BREACH OF CONTRACT

### *1. Generally Applicable Law*

The remaining three counts in this action are all for a breach of the lease agreement concerning the tower, generator, and transmission equipment. ECF No. 49, PageID.1103-1104. Contract interpretation is a matter of law. *See Sweebe v. Sweebe*, 712 N.W.2d 708, 711 (Mich. 2006). Under Michigan law, Lease Agreements are interpreted like any other contract. *See In re Smith Trust*, 745 N.W.2d 754, 757-58 (Mich. 2008). "[W]hen interpreting any contract, a court must 'determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning." *See Bingham Ctr. Owner, LLC v. Comcast of Florida/Michigan/New Mexico/Pennsylvania/Washington, LLC*, 603 F.Supp.3d 545, 548 (E.D. Mich. 2022) (citation omitted).

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014). For the remaining breach of contract claims in this action, the breach and damages elements are at issue.

***2. Count V: Breach of Contract for Premises Not Maintained***

Count V concerns the first question: whether a genuine dispute exists that WLAJ-TV breached the expired lease agreement upon vacating the premises without implementing the recommendations contained in the 2014 inspection report. ECF No. 28, PageID.512. In the Complaint, Tompkins asserts that a 2014 inspection commissioned by WLAJ-TV recommended repairs or maintenance on several items but that WLAJ-TV failed to implement the recommendations during their lease term. ECF No. 28, PageID.512-513.

WLAJ-TV generally argues no breach occurred because the tower was not a part of Tompkins' premises during the duration of the Lease Agreement—rather, it was tenant owned—and even if it was, the 2014 inspection report is not conclusive that WLAJ-TV failed to satisfy its maintenance obligation under the Lease Agreement. *See* ECF No. 49, PageID.1123. WLAJ-TV notes that the 2014 report concluded that the tower's main components were in satisfactory condition. *See* ECF No. 49, PageID.1116-1117, 1123. Additionally, WLAJ-TV argues that

Tompkins has not adduced any evidence to establish a causal link between the expenses incurred in Tompkins' post-lease work on the tower and WLAJ-TV's alleged failure to maintain the premises—rather, the changes Tompkins implemented after the lease term ended were voluntary upgrades. ECF No. 49, PageID.1124-1125. Thus, no reasonable jury could find it breached the lease by failing to maintain the premises. *See id.*

Tompkins, in contrast, argues that a genuine dispute of material fact exist on this claim because (1) the tower may be a fixture, not a trade fixture, under Michigan law, (2) the items identified in the inspection report were necessary repairs, not upgrades, that WLAJ-TV failed to make, and (3) the cost associated with those repairs are connected to WLAJ-TV's alleged breach. *See* ECF No. 52, PageID.1787-1795. As a matter of law, the Court disagrees with Tompkins and finds in favor of WLAJ-TV on Count V.

This claim encompasses two questions regarding the tower repairs. First, whether the tower was a part of the premises under the lease agreement and during the lease term, or whether it was tenant-owned.[2] Second, whether the recommended items in the 2014 inspection report regarding the tower were a part of WLAJ-TV's maintenance obligation under the lease. For reasons explained below, the Court

[2] As noted *supra*, WLAJ-TV transferred the tower to Tompkins after the lease ended. ECF No. 54, PageID.2161, n.1.

finds that the tower was not a part of the premises during the lease term, and that the recommended items in the 2014 inspection report were not part of WLAJ-TV's maintenance obligations.

**a. Whether the Tower was part of the premises or tenant-owned under the Lease Agreement.**

WLAJ-TV argues that prior to vacating the property, it owned the tower because predecessor tenants, and not Tompkins, built the tower *after* the lease was created; and the leased premises covered the land, not any improvement after the lease commencement. *See* ECF No. 49, PageID.1123, 1125. Tompkins, in response, argues that the tower was a permanent fixture that became its property upon installation, and because of its status as a fixture, the tower was part of the premises that WLAJ-TV was obligated to maintain. ECF No. 52, PageID.1779. The Court finds that the tower was not a part of the premises, and that Tompkins did not own it during the lease term—rather, WLAJ-TV and prior tenants owned it.[3]

Paragraph 15 of the Lease Agreement required the tenant to "keep the said premises and every part thereof in as good repair and at the expiration of the term yield and deliver up the same in like condition as when taken, reasonable use and

---

[3] Neither Tompkins' argument that the tower was a permanent fixture (*see* ECF No. 52, PageID.1779) nor WLAJ-TV's argument that the tower was a trade fixture (*see* ECF No. 54, PageID.2162-2163, n.2), analyzes the tower's status by applying Michigan law. *See Wayne Cnty. v. William G. Britton & Virginia M. Britton Trust*, 563 N.W.2d 674, 678 (Mich. 1997). Rather, both parties assess the tower's status and ownership through the terms of the Lease Agreement. The Court, accordingly, proceeds by doing the same.

wear thereof and damage by the elements excepted." ECF No. 52-3, PageID.1819. Tompkins points to the phrase "and every part thereof" to support its assertion that the tower was part of the premises, and accordingly, that WLAJ-TV was responsible for its maintenance. ECF No. 52, PageID.1787-1788. But the language of the lease itself undercuts this argument.

First, Paragraph 2 of the lease sets forth that the lease is for a metes-and-bounds parcel of real property. ECF No. 52-3, PageID.1818. It does not—and could not have—mentioned a tower, because the tower was not on the designated parcel of land at the lease's inception. Subsequent language in the lease confirms this: Paragraph 38 states that the "[t]enant shall contruct [sic] towers, transmission lines and building" in accordance with applicable local ordinances. ECF No. 52-3 PageID.1820. For WLAJ-TV to return the premises to Tompkins in the condition they were in when the lease began would be to return the land without the tower—a proposition WLAJ-TV proposed, and which Tompkins rejected. *See* ECF Nos. 49-10, 49-11, and 49-12.

Further, the record supports that during and after its construction, the tower remained tenant-owned. The tower was constructed by a tenant in 1990. ECF No. 49-4, PageID.1156. Though the tower had been constructed by a tenant over three decades earlier, the 2013 Assumption and Consent through which WLAJ-TV assumed the lease stated that it was for the real property identified in the 1982 lease,

while making no mention of the tower. ECF No. 52-3, PageID.1853. FCC records for the duration of the lease term also reflected continuous tenant ownership of the tower. *See* ECF Nos. 49-4, 49-5. Tompkins was not listed as the tower's owner until April 2023, which was after WLAJ-TV had vacated the property and had, at Tompkins' request, transferred tower ownership to Tompkins. *See* ECF No. 49-3. Tompkins' current ownership of the tower does not change the fact that it was tenant-owned for the three decades that preceded April 2023.

And even if the Tower were deemed a part of the premises, as discussed at greater length below, Tompkins' failure to establish the condition of the premises when WLAJ-TV's lease term ended would still prove fatal to Tompkins' maintenance claim.

**b. Whether the recommended items in the 2014 inspection report regarding the Tower were a part of WLAJ-TV's maintenance obligation under the Lease Agreement.**

Tompkins argues the Lease Agreement imposed a "clear and unambiguous maintenance obligation on WLAJ-TV" for the tower. *See* ECF No. 52, PageID.1787. WLAJ-TV counters that it was not aware of any lease-required maintenance obligation it failed to perform. *See* ECF No. 49, PageID.1124. The Court finds this claim fails as a matter of law based on the terms of the Lease Agreement. As noted above, the tower was tenant-owned until after the end of the lease term. *See* ECF Nos. 49-4, 49-5. And as it stands, the Agreement is void of an

express obligation for WLAJ-TV to make the recommended repairs in the 2014 inspection report, or any repairs to the tower under the terms of Section 15 of the Lease, as alleged by Tompkins in the Amended Complaint. *See* ECF No. 28, PageID.512-513.

Contract interpretation is a matter of law to be determined by the Court. *See Sands Appliance Servs., Inc. v. Wilson*, 615 N.W.2d 241, 238 (Mich. 2000). "The goal of contract interpretation is to first determine, and then enforce, the intent of the parties based on the plain language of the agreement." *Harbor Park Mkt., Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich. Ct. App. 2007). A contract must be construed so as to give effect to every word or phrase as far as practicable. *See Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003). Within this dispute and for majority of the lease term, the original provisions have remained intact, aside from a few modifications. So, the Court will evaluate three provisions from the original Lease Agreement that are applicable here: Section 13 for Repairs, Section 15 for Repairs and Alterations, and Section 18 for Care of Premises. *See* ECF No. 28, PageID.535.

Under Section 18, for CARE OF THE PREMISES, WLAJ-TV had the express obligation to "not perform any acts or carry on any practices which may injure the building or be a nuisance or menace to other Tenants in the building and shall keep premises under his control …. clean and free from rubbish, dirt, snow and ice at all

times[.]" *See* ECF No. 28, PageID.535. WLAJ-TV alleges that was done, and that it extended those services even after it moved off of the premises in 2020. *See* ECF No. 49, PageID.1116-1118.

Under Section 15, for REPAIRS AND ALTERATIONS, WLAJ-TV had the obligation

> that [it] will, at [its] own expense, during the continuation of this lease, **keep the said premises and every part thereof in as good repair and at the expiration of the term yield and deliver up the same in like condition as when taken**, reasonable use and wear thereof and damage by the elements excepted.

*See* ECF No. 28, PageID.535 (emphasis added).

The Court understands this provision to impose on WLAJ-TV an obligation to keep every part of the premises in good condition and return the property back to Tompkins in the same condition it was in when they obtained it. As discussed above, to truly return the property to Tompkins in the same condition as when they obtained it, WLAJ-TV would have needed to return the premises to Tompkins without the tower. *See* ECF Nos. 49-10, 49-11, and 49-12. WLAJ-TV represents it did return the real property to Tompkins in the same condition as it was in when they assumed the lease. *See* ECF No. 49, PageID.1116-1118. And Tompkins has failed to present sufficient evidence to the contrary. Instead, and as Defendants argue, the only evidence presented, the declaration of John Azar, is conclusory and does nothing to establish the condition of the premises when Tompkins began leasing the property

to tenants, or when the lease term ended. *See* ECF No. 54-5; *see also* ECF No. 54, PageID.2164. And without more, that is insufficient to create a genuine issue for trial.

Even assuming the tower were part of the premises WLAJ-TV was obligated to maintain under the Lease Agreement, two issues would prove fatal to Tompkins' claim that WLAJ-TV failed to maintain the tower. First—and crucially—none of the items listed in the 2014 report were apparently necessary for the Tower to be operational when WLAJ-TV came into its possession in 2013 as a successor to the Lease Agreement. ECF No. 28, PageID.568-574. This undermines Tompkins' argument that the recommendations were necessary repairs without which the tower could not operate, rather than mere recommendations.

Further, Tompkins has failed to link its post-lease work on the tower to WLAJ-TV's failure to implement the recommendations in the 2014 report. As noted above, and as WLAJ-TV points out, Tompkins has not established the condition of the tower and the premises at the expiration of WLAJ-TV's lease term. ECF No. 49, PageID.1124-1125. Additionally, the 2014 report noted that several key components of the tower and property were satisfactory. *See generally* ECF No. 50-2. And several of Tompkins' claimed post-lease expenses are for issues that apparently did not impact the tower's functionality,[4] were not required by the FCC

[4] *See* ECF No. 52-6, PageID.2089-2090 (listing the recommended repairs).

and FAA,[5] or that could have arisen long after the lease term ended.[6] Absent any evidence from Tompkins that its post-lease expenses flow from WLAJ-TV's failure to implement the 2014 recommendations during its lease term, the Lease would not have obligated WLAJ-TV to implement the report's recommendations. *See Celotex*, 477 U.S. at 325 ("the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").[7]

Tompkins attempts to argue that an email chain with representatives from Nexstar Media Group, WLAJ, and Mission is sufficient to establish that WLAJ-TV knew it had an obligation to maintain the tower. *See* ECF No. 52, PageID.1789 (citing ECF No. 52-7). Not so. Intent of the contracting parties is determined by reference to the contracting language alone; intent cannot be determined from an outside source. *See Hubbel, Roth & Clark, Inc. v. Jay Dee Contractors, Inc.*, 642

---

[5] *See* ECF No. 50-7, PageID.1602-1604 (describing lighting system as "old and in need of repair" without noting specific functionality issues); *see also* ECF No. 50, PageID.1433-1434 (describing tower wiring as "good").

[6] *See* ECF No. 50, PageID.1443-1446, 1450, 1457 (noting Tompkins' costs for 2025 weed removal, 2024 pipe winterization, and clearing debris in 2024 and 2025).

[7] The only significant overlap between the 2014 recommendations and the post-lease repairs pertained to the grounding system. The 2014 recommendations included a recommendation to "Install new ground rods and properly attach the ground wires at the SE and NE outer anchors." ECF No. 50-2, PageID.1571. After the end of WLAJ-TV's lease term, Tompkins replaced the entire transformer grounding system. ECF No. 52, PageID.1784. However, the 2014 report merely noted that one ground wire was not attached to a ground rod, and that another rod was pulled out of the ground, not that the entire system needed to be replaced. ECF No. 50-2, PageID.1542-1543. Tompkins has not produced evidence that at the time of the 2014 report, or at the end of WLAJ-TV's lease term, that the entire grounding system needed to be replaced.

N.W.2d 700, 702 (Mich. Ct. App. 2001). And contrary to Tompkins' assertion, the Court—being well familiar with the facts of this case and contract language at issue—finds that the text of the Lease Agreement is not ambiguous so as to permit the admission of extrinsic evidence. Each word included means exactly what it says. Though the language may be dated, the parties' original intent behind each paragraph in the contract, based on the words and terms used within the four corners of the agreement, is clear. *Cf.* ECF No. 52, PageID.1790; *accord Sweebe*, 712 N.W.2d at 711.

Finally, Tompkins argues that WLAJ-TV denied them access to the premises, and in doing so, thwarted their ability to identify and remediate any maintenance issues prior to the end of the lease term. ECF No. 52, PageID.1781. But the record flatly contradicts this argument. As early as December 4, 2020, WLAJ-TV offered Tompkins a key to the transmitter building. ECF No. 50-11, PageID.1660. An email dated June 7, 2022, stated that Tompkins "ha[d] access to the site" and they "were happy with the buildings and the tower." ECF No. 50-4, PageID.1577. And a demand letter from Tompkins to WLAJ-TV, dated November 11, 2022, states that Tompkins "had the opportunity to inspect the property," but did not flag any concerns about the appearance or maintenance of the premises. ECF No. 50-6, PageID.1589. No reasonable jury could find that Tompkins' belated remediation efforts were caused by WLAJ-TV's failure to grant access to the premises.

And even if there were merit to the argument that WLAJ-TV denied access to Tompkins, Section 26 of the Lease Agreement expressly stated that Tompkins had "the right to enter upon the leased premises at all reasonable hours for purpose of inspecting the same." ECF No. 28, PageID.536. As was true in a previous Order, *see* ECF No. 45, PageID.934-935, n.15, Tompkins has not adduced any evidence that explains why availing itself of this Lease provision was not an option.

In sum, the terms of the Lease Agreement do not lead to an interpretation that the recommendations in the 2014 report were part of WLAJ-TV's maintenance obligations. Further, Tompkins has failed to establish that the maintenance issues it addressed after WLAJ-TV's lease term ended were present at the end of WLAJ-TV's tenancy, or that WLAJ-TV barred them from accessing the premises. It is not enough for Tompkins to come forward with declarations that support its assertions when they are expressly contradicted elsewhere in the record: "self-serving affidavits, standing alone and without support in the record, will not defeat a motion for summary judgment." *Williams v. Shelby Cnty. Bd. of Educ.*, No. 217CV02050TLPJAY, 2020 WL 1822475, at *6 (W.D. Tenn. Apr. 10, 2020) (citing *Freeman v. Trombley*, 483 F. App'x 51, 58 (6th Cir. 2012) ("[A] self-serving affidavit must be reviewed with great skepticism.")).

Nonetheless, no reasonable jury could find that WLAJ-TV breached the expired Lease Agreement by failing to fulfill an obligation that is not stated within

the terms of that agreement. And without a breach, Tompkins could suffer no damages for the repairs it voluntarily undertook after the end of WLAJ-TV's lease term as a matter of law. Consequently, summary judgment is granted in favor of Defendants as to Count V.

### *3. Counts VIII and IX: Breach of Contract for Removal of Generator & Transmitter Equipment*

Counts VIII and IX survived the pleading stage because in that procedural posture, the Court was required to take Tompkins' allegations about its ownership of the transmitter and generator as true. *See Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020) (describing how courts, when assessing a motion to dismiss or motion for judgment on the pleadings, must accept all well-pleaded factual allegations as true). But under Rule 56, summary judgment must enter ". . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[.]" *Celotex*, 477 U.S. at 322.

WLAJ-TV has moved for summary judgment on Counts VIII and IX, arguing that both the transmitter and generator are removable trade fixtures and, accordingly, were its property—not Tompkins'—at the end of the lease term. *See* ECF No. 49, PageID.1105. Tompkins, in turn, argues that summary judgment on Counts VIII and IX should be denied because WLAJ-TV breached the Lease Agreement by removing the transmitter and generator from its property at the end of the lease term and also asserts that the transmitter and generator should be characterized as property

fixtures. *See* ECF No. 28, PageID.521, 523; ECF No. 52, PageID.1796. WLAJ-TV disagrees, arguing that the broadcast equipment and generator were both "acquired, installed, replaced, and used by successive tenants that were licensed to own and operate WLAJ(TV)." *See* ECF No. 49, PageID.1105; ECF No. 54, PageID.2167. WLAJ-TV further opines that because Tompkins failed to produce any evidence that it purchased the generator or transmitter, both claims fail as a matter of law. ECF No. 49, PageID.1104-1105. The Court agrees with WLAJ-TV and finds that both the transmitter and generator are removable trade fixtures.

Section 15 of the Lease Agreement provided that

> [t]he Tenant shall not make any alterations, additions or improvements to said premises without the Landlord's written consent, and all alterations, additions or improvements made by either of the parties hereto upon the premises, *except* movable office furniture and *trade fixtures put in at the expense of the Tenant*, shall be the property of the Landlord, and shall remain upon and be surrendered with the premises at the termination of this lease[.]

*See* ECF No. 28, PageID.535 (emphasis added).

Under Michigan law, "[p]roperty is a fixture if the following three criteria exist: (1) 'annexation to the realty, either actual or constructive;' (2) 'adaptation or application to the use or purpose to which that part of the realty to which it is connected is appropriated;' and (3) 'intention to make the article a permanent accession to the freehold.'" *See CGFH Gainsboro, LLC v. Revocoat US, Inc.*, No. 2:17-cv-12144, 2019 WL 355636, at *4 (E.D. Mich. Jan. 29, 2019) (citing *Wayne*

*Cnty. v. William G. Britton & Virginia M. Britton Trust*, 563 N.W.2d 674, 678 (Mich. 1997)). "Intent may be inferred form the nature of the article affixed, the purpose for which it was affixed, and the manner of annexation." *See Wayne Co.*, 563 N.W.2d at 681. A trade fixture, on the other hand, is defined as "merely a fixture which has been annexed to leased realty by a lessee for the purpose of enabling [them] to engage in a business." *See Michigan Nat'l Bank, Lansing v. City of Lansing*, 293 N.W.2d 626, 628 (Mich. Ct. App. 1980). The form and size of the items at issue do not determine whether an item is a trade fixture. *Outdoor Sys. Advert., Inc. v. Korth*, 607 N.W.2d 729, 731 (Mich. Ct. App. 1999).

As an initial matter, Tompkins attempts to elide WLAJ-TV's argument that the transmitter and generator are removable trade fixtures by applying the *Morris* test for property fixtures. *See* ECF No. 52, PageID.1804-1805; *see also Morris v. Alexander*, 208 Mich. 387, 391 (1919). But that argument is a red herring: a trade fixture is, by definition, a fixture—trade fixture doctrine simply recognizes that because the equipment or property at issue is on the leased realty specifically so the lessee can carry out their business, the property belongs to the lessee, not the landlord. *See Outdoor Sys. Advert.*, 607 N.W.2d at 731 (citing *Cameron v. Oakland Co. Gas & Oil Co.*, 269 N.W. 227, 230 (Mich. 1936)). Here, the record establishes that both the transmitter and generator were removable trade fixtures under the Lease. *See* ECF No. 49, PageID.1128-1130; ECF No. 49-7, PageID.1188-1189.

Begin with the transmitter. The transmitter was not on the property from the lease's inception. ECF No. 49-15, PageID.1252. WLAJ-TV (and the tenants who preceded them) purchased their own transmitters and used the transmitters to broadcast from their FCC-assigned channels. ECF No. 49, PageID.1111-1113. Further, the transmitter was not a general-purpose asset that could be used by anyone—indeed, WLAJ-TV itself could not even use the same transmitter for the full length of its tenancy. ECF No. 49-1, PageID.1141. This is because WLAJ-TV had to change the transmitter each time the FCC changed its assigned channel. ECF No. 49-1, PageID.1140-1142; ECF No. 49-6, PageID.1178. The record reflects that as the FCC repacked channels and reassigned WLAJ(TV) from one channel to another, the transmitter changed along with the FCC-assigned channel. ECF No. 49-1, PageID.1141-1142.

WLAJ-TV asserts that the process of reconfiguring a transmitter to adapt to a new channel requires such extensive modification that it is a standard industry practice to simply change transmitters when FCC changes a channel, rather than adapt the transmitter already present on-site. ECF No. 49-7, PageID.1188. Tompkins does not contest this; it simply argues that it needs a transmitter at the site. ECF No. 52, PageID.1804-1805. But the need for "a transmitter" does not equate to the need for "the specific transmitter" WLAJ-TV used to broadcast its FCC assigned channel. And the record is void of any evidence that would lead a reasonable jury

to find anything other than the transmitter was specific to WLAJ-TV's broadcasting at any given time. Therefore, the Court finds that, as a matter of law, the transmitter was a trade fixture and consequently the property of WLAJ-TV, not Tompkins. *See Michigan Nat'l Bank, Lansing*, 293 N.W.2d at 628.

Likewise, the Court finds that the generator was also a removable trade fixture, not a permanent fixture to the property. Though Tompkins characterizes the generator as adapted to support tower lighting, *see* ECF No. 52, PageID.1800, the record shows that its purpose was to support the transmitter. The generator was tenant-purchased and tenant-installed, and in 2013, was listed in the asset schedule as the "300kw generator *for transmitter*." ECF No. 49-17, PageID.1365 (emphasis added). Further, the replacement generator Tompkins purchased in 2025 used significantly less power (45kw) than the WLAJ-TV generator (300kw). ECF No. 52-4, PageID.1924. The power discrepancy between the generators reinforces WLAJ-TV's argument that the 300kw generator was a companion to the transmitter and was used specifically to support operation of WLAJ-TV's station and broadcast, not simply to support the tower's lights in the event of a power outage, as Tompkins argues. *See* ECF No. 49, PageID.1130; ECF No. 52, PageID.1800-1801. WLAJ-TV's description of the generator as "permanent" does not impact this conclusion, as the description simply distinguishes the standing generator from mobile generators that were also at times used at the site. ECF No. 49-1, PageID.1142.

Finally, Tompkins' other arguments regarding the transmitter and generator fail. Tompkins argues that the absence of the transmitter and generator would make it impossible for the tower to function; however, they concede that T-Mobile was still able to operate from the tower after WLAJ-TV removed the transmitter and generator. ECF No. 28, PageID.499. Tompkins also argues that who paid for the generator and transmitter is not dispositive. *See* ECF No. 52, PageID.1801-1802. But WLAJ-TV and prior tenants paid for both, and Section 15 of the Lease Agreement specifically exempts "trade fixtures put in at the expense of the tenant" from becoming Tompkins' property upon the expiration of the Lease. ECF No. 28, PageID.535; ECF No. 49, PageID.1111-1112.

Because Tompkins has produced no evidence to show that it owned either the transmitter or the generator at any point during the lease term, summary judgment in favor of Defendants is warranted. It is apparent, on the record before the Court, that no reasonable jury could find that WLAJ-TV breached the Lease Agreement by keeping the transmitter and generator after the lease term ended. Defendants' request for summary judgment on Counts VIII and XI is therefore granted.

**B. GUARANTY LIABILTY**

Finally, under Count XI, Tompkins asserts a claim for breach of the Assumption and Consent Agreement against Sinclair for WLAJ-TV's alleged breaches and "other wrongful conduct". *See* ECF No. 28, PageID.529-530. Sinclair

argues that because WLAJ-TV is not liable for any breaches of contract, neither should it be held liable as a guarantor to the Lease Agreement. *See* ECF No. 49, PageID.1131-1132. The Court agrees.

Under the terms of the Lease Agreement, which includes the Assumption and Consent Agreement, "Sinclair agrees to remain liable to the Landlord to fully perform according to the terms of the Lease." *See* ECF No. 28, PageID.569. The Court determined in its prior Order that Sinclair's liability it is limited to the "terms of the lease," which would only apply to the breach of contract claims. *See* ECF No. 45, PageID.948-949 (citing ECF No. 28, PageID.569, ¶10; PageID.571-572).

Because the three claims that remained in this matter against WLAJ-TV (Counts V, VIII, and IX) fail as a matter of law, Sinclair is discharged from liability to Tompkins for any of their claims. *See Wallace Hardware Co. Inc. v. Abrams*, 223 F.3d 382, 401 (6th Cir. 2000). Therefore, summary judgment is appropriate on Count XI in favor of Sinclair.

## IV.

For these reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 49) on all remaining claims.

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Amended Complaint (ECF No. 28) is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that all other pending motions (ECF Nos. 48, 61, 62, 63, 64) are **DENIED AS MOOT**.

***This is a final order that closes this case.***

**IT IS SO ORDERED**.

Dated: November 25, 2026
Detroit, Michigan

s/Brandy R. McMillion
HON. BRANDY R. MCMILLION
United States District Judge